## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

**NJERI WILLIAMS**

      **Plaintiff,**                      **1:23-cv-01474**
                                            **Judge Timothy J. Kelly**

      **v.**

**AMERICAN AIRLINES, INC.**

      **Defendants.**

## PLAINTIFF NJERI WILLIAMS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANT AMERICAN AIRLINES INC.'S MOTION FOR SUMMARY JUDGMENT

COMES NOW Plaintiff Njeri Williams, by and through her undersigned counsel, and hereby responds in opposition to the Motion for Summary Judgment (Doc. #34), and Memorandum of Points and Authorities in support thereof (Doc. #34-1), filed by Defendant American Airlines, Inc ("American Airlines").

This action is not governed by traditional principles of negligence. Instead, it is governed by the Montreal Convention. Pursuant to the Montreal Convention, there is no burden on the plaintiff to prove, by a preponderance of the evidence, that Defendant's negligence contributed to cause the plaintiff's injuries.

Instead, as to the first  in economic and/or non-economic damages suffered by the plaintiff, the Montreal Convention subjects Defendant American Airlines to a regime of "virtual strict liability." And as to Plaintiff's damages above $171,469.78, the Montreal Convention places the burden on the defendant to prove, at trial, that its negligence did not contribute to causing the harm.

In this case, since the incident in question falls within the broad ambit of an "accident" under the Montreal Convention, Defendant's Motion for Summary Judgment is due to be denied

as to the plaintiff's first $171,469.78 in damages. And since significant questions of material fact exist from which jurors could reasonably find that Defendant is unable to carry its burden at trial, Defendant's Motion for Summary Judgment is likewise due to be denied as to Plaintiff's damages in excess of $171,469.78.

## FACTUAL BACKGROUND

On May 30, 2021, Plaintiff was seriously injured while aboard an American Airlines flight at Ronald Reagan Washington National Airport ("DCA") as a result of the negligent behavior of the American Airlines management and staff when the Defendant American Airlines failed to manage an irate passenger ("Passenger 9F") in a safe and controlled manner that would prevent Passenger 9F from harming other passengers. *See* Plaintiff's Amended Complaint ["Am. Compl."] at ¶¶ 5, 32-67. Plaintiff, her mother, Gillian Branch, and her cousin, Tiffany Branch, were traveling aboard American Airlines flights from Bridgetown, Barbados to New York, New York via stops in Charlotte, North Carolina and the Washington, D.C. area. *See* **Exhibit 1** – Plaintiff's Answers to Defendant's Interrogatories ["Plt. ATI"] at No. 1.

On the evening of May 30, 2021, Plaintiff and her travel companions boarded Flight AA2123 at DCA bound for John F. Kennedy International Airport ("JFK") in New York, New York. *See* Am. Compl. ¶ 6; **Exhibit 1**, Plt. ATI at No. 1. Plaintiff was one of the first passengers to board Flight AA2123 at DCA. *See* **Exhibit 2** – Transcript of Deposition of Plaintiff Njeri Williams ["Plt. Dep. Trans."] at 111:12-20. Upon boarding Flight AA2123, Plaintiff was seated in seat 1D. *See* **Exhibit 2**, Plt. Dep. Trans. at 113:16 – 114:2. Plaintiff's mother and cousin were seated in the economy class cabin of Flight AA2123. *See* **Exhibit 1**, Plt. ATI No. 1.

Plaintiff, Plaintiff's mother, and Plaintiff's cousin were all seated on the right side of Flight AA2123 when facing forward toward the front of the plane. *See* **Exhibit 3** – Transcript of

Deposition of Gillian Branch ["G. Branch Dep. Trans."] at 49:11-17, 50:12-18. Plaintiff's mother was seated in the middle seat of her row on Flight AA2123. *See* **Exhibit 3**, G. Branch Dep. Trans. at 49:21 – 50:2.

Plaintiff's cousin was also seated in the middle seat of her row on Flight AA2123. *See* **Exhibit 4** – Transcript of Deposition of Tiffany Branch ["T. Branch Dep. Trans."] at 24:7-9. There was a wall, or bulkhead, separating the first-class cabin from the economy cabin behind the first-class cabin on Flight AA2123. *See* **Exhibit 4**, T. Branch Dep. Trans. at 23:19-22. There was nothing about the boarding process of Flight AA2123 that made Plaintiff concerned about her safety on the aircraft. *See* **Exhibit 2**, Plt. Dep. Trans. at 116:11-14.

At some point during the boarding process of Flight AA2123, Plaintiff fell asleep. *See* id. at 119:10-15. Plaintiff was asleep in her seat, 1D, from some point during the boarding process until she was awakened by the impact of Flight Attendant Jane Sy falling onto her. *See id.* at 124:1-5;130:9-21; 133:18-134: Flight AA2123 was boarded without incident at DCA on the evening of May 30, 2021. *See* **Exhibit 5** – Transcript of Deposition of Abigail McMahon ["McMahon Dep. Trans."] at 35:21 – 36:3.

During the Flight's safety demonstration, Flight Attendant Abigail McMahon noticed Passenger 9F having a hostile and aggressive FaceTime call on her phone, even after passengers had been instructed to place their phones in airplane mode because the plane's doors were closed. *See* **Exhibit 5**, McMahon Dep. Trans. at 36:8 – 37:2. Passenger 9F ignored Ms. McMahon's instructions to end her FaceTime call and continued using combative and argumentative language that was making other passengers uncomfortable. *See* id. at 37:3-7. Ms. McMahon then asked Passenger 9F, again, to place her phone in airplane mode, which caused Passenger 9F to turn her aggression to Ms. McMahon and start swearing and cursing at her. *See id.* at 37:7-11. Once

Passenger 9F became aggressive towards Ms. McMahon, the cabin crew decided to stop the safety demonstration and contact the Captain to alert him of the situation with Passenger 9F. *See id.* at 37:11-15. Lead Flight Attendant Keone Dent contacted the Captain of Flight AA2123. *See id.* at 37:16–38:2.

The Captain agreed with the cabin crew's assessment and decided to return the aircraft to the gate at DCA and to have Passenger 9F removed from the flight due to her non-compliance with flight attendant instructions. *See id.* at 37:16–38:2.

[redacted]

[redacted]

Once the plane returned to its gate, Ms. McMahon disarmed her rear doors and then walked to the front of the plane to speak with the responding airport-based managers. *See* Exhibit 5, McMahon Dep. Trans. at 38:8-17. Flight Attendant Jane Sy remained in the rear of the plane after the doors were disarmed. *See* **Exhibit 9** – Transcript of Deposition of Jane Sy ["Sy Dep. Trans."] at 19:10-14. When the plane's door was opened after returning to the gate, Ms. McMahon saw law enforcement officers and one AA manager waiting on the jet bridge. See **Exhibit 5**, McMahon Dep. Trans. at 38:18 – 39:5.The responding AA manager boarded the plane and went to speak with Passenger 9F at her seat. *See* id. at 39:8 – 9; Am. Compl. ¶ 20.

As the responding AA manager was speaking with Passenger 9F at her seat, he did not inform her of the Captain's decision to have her removed. *See* **Exhibit 10**, Defendant AA Doc. Production 1 ("AA RPD 1") at AA-WILLIAMS 000004; **Exhibit 7**, Zeinkievicz Dep. Trans. at 85:11 – 86:2; **Exhibit 8**, Lord-Jones Dep. Trans. at 124:2 – 125:13. Rather, the AA manager asked Passenger 9F to exit the plane and speak with him. *See id.* The AA manager told Passenger 9F that "she could leave her bags, because he just wanted to speak with her at that point." *See id.* Based on the AA manager's statement, Passenger 9F voluntarily agreed to leave her seat and speak with the AA Manager. *See id.*

However, Passenger 9F subsequently uttered words that made it seem as if she was not certain whether she was being removed from the flight. *See id.* As Passenger 9F walked towards the front of the plane, she stated that "she did not want to leave her bags if she 'was getting kicked off the plane.'" *See* **Exhibit 10**, AA RPD 1 at AA-WILLIAMS 000004; **Exhibit 8**, Lord-Jones

Dep. Trans. at 124:2 – 125:13.

Passenger 9F and the AA manager proceeded to the front of the plane in the area between the flight deck door and the boarding door**. Exhibit 5**, McMahon Dep. Trans. at 39:19 – 42. The AA manager did not escort Passenger 9F off the plane onto the jet bridge. *See id.* Rather, the AA manager continued to speak with Passenger 9F on and in the area between the flight deck door and the boarding door. *See id.* at 39:19 – 40:9. The AA manager allowed Passenger 9F to remain on and in this area of the plane while Passenger 9F continued to scream at Flight Attendant McMahon, demanding to know her name, trying to reach for Ms. MacMahon's lanyard to read her ID, and threatening Ms. McMahon with legal action. *See id.*

While all of this was taking place between the AA manager and Passenger 9F, AA management and law enforcement had asked the flight crew to make an announcement to identify a passenger onboard the aircraft who had left a wallet in the gate area of the airport. See *See id.* at 38:18 – 39:5. Flight Attendant Jane Sy had heard the announcement and used the plane's interphone to communicate with the flight attendants in the forward galley to advise that she had identified the passenger missing the wallet and that Ms. Sy would come to the front of the plane to retrieve the wallet. *See id.* at 40:10-17.

As Ms. Sy walked towards the front of the plane, Passenger 9F was still in the front area of the plane between the flight deck door and the boarding door. *See id.* at 39:19 – 40:9.24; *See* **Exhibit 9**, Sy Dep. Trans. at 28:3 – 6. As Ms. Sy proceeded towards the front of the plane to retrieve the wallet, she was aware that the situation with Passenger 9F had not been fully resolved. *See* **Exhibit 9**, Sy Dep. Trans. at 19:10-20:7.

Ms. Sy knew that Passenger 9F was still in the front of the airplane. *See id.* at 26:5-26:11. Ms. Sy proceeded to the front of the plane to retrieve the wallet "almost right away" after Passenger

9F was escorted to the front of the plane. *See id.* at 27:21-28:2. Ms. Sy went to grab the wallet for the passenger because she did not want the passenger to be involved in the situation with or get hurt by Passenger 9F. *See id.* 19:10 – 20:7; 54:13 – 20; 61:2 – 62:4. Ms. Sy went to grab the wallet while the situation with Passenger 9F was still being resolved-not out of necessity-but because, she felt there was a sense of urgency because the passenger "wanted it physically with him." *See id.* 55:18 – 59:4.

The passenger who had lost his wallet was scheduled to fly from DCA to JFK and then onto an international flight from JFK. *See id.* Ms. Sy could have waited until the plane was at altitude and serving refreshments before she went to get the wallet, however, she went to grab the wallet while the situation with Passenger 9F was ongoing because she "wanted to reassure [the passenger] that he was going to physically get his [wallet] for the international flight he was about to embark upon from JFK." *See id.* As she approached the front of the aircraft, Ms. Sy would have had an unobstructed view of the aisle before her all the way to the flight deck door. See Exhibit 8, Lord-Jones Dep. Trans. at 83:15 – 22.

Ms. Sy was facing forward, towards the front of the aircraft, as she attempted to reach for the wallet from Mr. Dent. *See* **Exhibit 9**, Sy Dep. Trans. at 29:7-11. As Ms. Sy was coming up to the front of the aircraft to retrieve the wallet, the AA manager had not yet escorted Passenger 9F off of the aircraft but had allowed Passenger 9F to remain on the plane as he spoke with her. *See* **Exhibit 5**, McMahon Dep. Trans. at 40:17-19. The AA manager had allowed Passenger 9F to remain on the plane between the flight deck door and the boarding door and scream at and threaten Flight Attendant McMahon. *See id.*

At some point, Passenger 9F became aware that she was being removed from the plane and decided to attempt to retrieve her bags. *See* **Exhibit 8**, Lord-Jones Dep. Trans. at 73:22–74:3; *See*

**Exhibit 10**, AA RPD1 at AA-WILLIAMS 000004. Passenger 9F then attempted to bypass the GSC to go back down the aisle. *See* **Exhibit 10**, AA RPD 1 at AA-WILLIAMS 000004. The GSC put his arms up to block her movement, but Passenger 9F pushed past the GSC to continue down the aisle. *See id.* As Ms. Sy was walking to retrieve the wallet, Passenger 9F proceeded past the GSC. *See id.*; *See* **Exhibit 9**, Sy Dep. Trans. at 29:7-11. As Passenger 9F proceeded past the GSC, Ms. Sy had reached the front of the plane to grab the wallet and was reaching to grab it from Mr. Dent. *See* **Exhibit 9**, Sy Dep. Trans. at 29:7-11.

While Ms. Sy was reaching for the wallet from Mr. Dent, Passenger 9F came upon Ms. Sy, stated to Ms. Sy "Move you stupid f\*\*king b\*tch," and then assaulted Ms. Sy. See *See id.* at 20:8-13. Ms. Sy recalled that Passenger 9F struck her and then pushed her, causing Ms. Sy to lose her balance and fall onto Ms. Williams. *See id.* at 20:14-17.

Ms. Sy completed an American Airlines CERS report shortly after the incident and stated therein that the right side of her body hit the arm rest of the first class and on top of a passenger. *See* **Exhibit 11**- Defendant AA Doc. Production 2 ("AA RPD 2") at AA-WILLIAMS 000097. Ms. Sy also completed a report for the Metropolitan Washington Airports Authority shortly after the incident and stated therein that she fell on the ground and on top of a passenger in first class seat. See **Exhibit 10**, AA RPD 1 at AA-WILLIAMS 000011. Officer Shannon Newman asked Ms. Sy, what happened shortly after she was assaulted by Passenger 9F and Ms. Sy told Officer Newman that "Passenger 9F assaulted her, by elbowing and punching her left arm, causing her to fall on top of another passenger." *See* **Exhibit 10**, AA RPD 1 at AA-WILLIAMS 000004.

33(d). Officer Newman's report indicates that the passenger that Ms. Sy fell on was later identified as Ms. Njeri Williams. *See id.*

Because she was asleep, Plaintiff has no first-hand knowledge as to what did or did not

occur on Flight AA2123 from the time that the plane pushed back from the gate at DCA until the time Ms. Sy fell on and made impact with Plaintiff's body. *See* **Exhibit 2**, Plt. Dep. Trans. at 124:1-13; 130:9-21; 133:18-134. However, after Ms. Sy struck Ms. Williams, Ms. Williams woke up in pain to nearby passengers asking her if she was okay. *See id.* at 130:9-21; 133:18-134: Ms. Williams recalls that Ms. Sy fell on her back and as a result, Ms. Williams' body went forward toward the wall in front of her and then her body came backwards and she hit her head on the seat. *See id.* at 134:1-137:10.

Because she was asleep, Plaintiff has no first-hand, independent knowledge as to how long it took to remove Passenger 9F from Flight AA2123 once the aircraft returned to the gate at DCA. *See id.* at 152:3-13. However, Defendant's employee, Ms. McMahon reported to Defendant that the incident occurred because "The responding officers and management did not remove the passenger in a timely manner, and allowed her to pause in the galley and remain onboard the aircraft for longer than she should have. Simultaneously, management instructed us to resolve a significantly less pressing issue during a safety critical moment. The physical assault on Jane by Frasier occurred because of these actions by management and the responding law enforcement officers." **Exhibit 5**, AA RPD 2 at AA-WILLIAMS 000092. Ms. McMahon also reported that an AA manager remarked that Ms. Sy contributed to the incident between Ms. Sy and Passenger 9F as follows: "While we were giving our accounts to everyone, the CSM said "well, you walked into the situation" to Jane which was absolutely uncalled for, untrue, and upsetting to hear. Jane was the victim of a violent assault by a hostile passenger that we had requested be removed well before the assault took place." **Exhibit 5**, AA RPD 2 at AA-WILLIAMS 000091.

Ms. McMahon stated in her CERS Report that unruly passenger incidents had become a frequent occurrence resulting in flight attendant attacks and injuries as follows: "I would like a

follow-up on what actions will take place and what will prevent such an incident from happening again. For several months, there has been a dramatic increase of physical and verbal assault(s) against crew members by passengers." **Exhibit 5**, AA RPD 2 at AA-WILLIAMS 000092.

The situation with Passenger 9F aboard Flight AA2123 which resulted in Plaintiff being seriously injured was the result of a sequence of events that included the following actions by AA staff:

(i) The AA manager's decision not to immediately communicate to Passenger 9F the captain's decision to remove her from the flight; *See* **Exhibit 10**, Defendant AA Doc. Production 1 ("AA RPD 1") at AA-WILLIAMS 000004; **Exhibit 7**, Zeinkievicz Dep. Trans. at 85:11 – 86:2; **Exhibit 8**, Lord-Jones Dep. Trans. at 124:2 – 125:13.

(ii) The AA manager's decision to request Passenger 9F to exit the aircraft for the purpose of only speaking with him; *See id.*

(iii) The AA manager's decision to advise Passenger 9F that she could leave her bags behind because he only wanted to speak with her at that point; *See id.*

(iv) The AA manager's decision to leave Passenger 9F's bags on the plane while he attempted to speak with her. *See id.*

(v) AA management's decision to page a passenger to retrieve his lost wallet from the front of the plane while the situation with Passenger 9F was still being resolved; **Exhibit 5**, McMahon Dep. Trans. at 54:4 – 55:7; 83:12 – 86:9; **Exhibit 8**, Lord-Jones Dep. Trans. at 111:6 – 113:13; 131:18 – 132: 6.

(vi) The AA manager's decision to permit Passenger 9F to remain on the plane between the flight deck door and the boarding door and scream at, reach for, and threaten

Flight Attendant Abigail McMahon with legal action; **Exhibit 5**, McMahon Dep. Trans. at 39:19 – 40:9; **Exhibit 8**, Lord-Jones Dep. Trans. at 118:14 – 119:5; 128:22 – 130:19.

(vii)    Ms. Sy's decision to retrieve a passenger's wallet while the situation with Passenger 9F was still ongoing; **Exhibit 9**, Sy Dep. Trans. at 19:10-20:7; 55:18 – 59:4; **Exhibit 5**, McMahon Dep. Trans. at 54:4 – 55:7; 83:12 – 86:9; **Exhibit 8**, Lord-Jones Dep. Trans. at 111:6 – 113:13; 131:18 – 132: 6.

(viii)    The AA manager's inability to stop and prevent Passenger 9F from pushing past him and into the aisle of the plane. **Exhibit 10**, AA PRD 1 at 000004. **Exhibit 8**; 129:3 – 130: 19.

45.    Defendant and Plaintiff's experts both agree that the AA manager/GSC and airline crew must take responsibility for the discretionary decisions they make when responding to a situation involving a disruptive passenger. *See* **Exhibit 8**, Lord Jones Dep. at 106:18 - 108:8; **Exhibit 7**, Zienkievicz Dep. Trans. at 59:15 - 61:4; 86:19 - 88:1.

51.    Defendant's expert opined that Passenger 9F was the "primary" person at fault for the incident while Abigail McMahon and Plaintiff's expert opined that AA management's negligent actions contributed to the incident. **Exhibit 7**, Zienkievicz Dep. Trans. at 52:12-57:8

## LEGAL BACKGROUND

An airline is well within its rights, of course, in choosing to remove such a passenger. But when it does so, the airline must take reasonable steps to accomplish that removal in a manner that protects other passengers from the preventable risk of harm.

*A.*    <u>***The Three (3) Relevant Standards That Apply to an Airline's Removal of a Disruptive Passenger***</u>

Specific federal regulations[1] and industry guidelines[2] apply in this circumstance.  American Airlines has also established its own mandatory procedures that apply to its removal of nonviolent but disruptive passengers.[3]

The federal regulations and industry guidelines that apply, together with American Airlines' internal procedures, are each widely-accepted, uncontroversial, and intended to prevent needless risk.



Exhibit 6, at AA-WILLIAMS 000052 (emphasis added).

(2)    <u>**When the Disruptive Passenger is Removed, His or Her Carry-On Items Must Be Removed as Well.**</u>

The International Air Transport Association ("IATA") is a trade association that represents over 300 airlines.[5]  One of its stated purposes is to develop global standards that, if followed, allow

---

[1] *See* Pl.'s Ex. 8, K. Lord-Jones Dep., 69 :25 – 71 :7, and 77:14-25.
[2] *See* Def.'s Ex. G, Report of Plaintiff's Expert Kathleen Lord-Jones, p. 5-6 of 8.
[3] *See* Pl.'s Ex. 6, American Airlines internal procedures, at AA-WILLIAMS 000046 – 000078 (filed under seal).
[4] *See* Pl.'s Ex. 6, at Bates pages AA-WILLIAMS 000047 – 000061.
[5] *See* Def.'s Ex. G, Report of Plaintiff's Expert Kathleen Lord-Jones, p. 5 of 8.

those airlines to operate profitably and safely.[6]  In that regard, the IATA has issued guidance applicable to airline personnel's interaction with unruly passengers.  The second edition of the IATA's *Guidance on Unruly Passenger Prevention and Management* was published in 2015.[7]  No newer edition of that guidance was issued prior to the incident that gives rise to this case.

The second edition of the IATA's *Guidance on Unruly Passenger Prevention and Management* states that "[i]f a passenger engages in disruptive behavior while the aircraft is still on the ground, and unless the situation can be resolved to the satisfaction of the on-board crew members, he/she should be removed <u>along with his/her baggage</u>."  Def.'s Ex. G, Report of Plaintiff's Expert Kathleen Lord-Jones, p. 5-6 of 8 (quoting *Guidance on Unruly Passenger Prevention and Management*, 2d ed., § 3.4.4.4).

Common Transportation Security Administration ("TSA") regulations likewise require a passenger's carry-on items to remain with the passenger at all times.[8]  In the context of a disruptive passenger's removal from a plane, these regulations require the disruptive passenger's carry-on items to be removed either with or immediately after the disruptive passenger.[9]

> **(3)**     <u>**The Airline's Removal of a Passenger Must Be Accomplished in a Manner That is Timely, Without Any Unnecessary Delay.**</u>

Properly trained and experienced airline personnel know that the removal of a disruptive passenger, once it is begun, must be completed as expeditiously as possible.[10]  Any unnecessary delay in that process, which is not necessary for the safety of other passengers or airline personnel,

---

[6] *See* https://www.iata.org/en/about/mission/
[7] *See* Def.'s Ex. G, Report of Plaintiff's Expert Kathleen Lord-Jones, p. 5 of 8.
[8] *See* Pl.'s Ex. 8, K.Lord-Jones Dep., 69:25 – 70:16.
[9] *See* Pl.'s Ex. 8, K.Lord-Jones Dep., 69:25 – 71:7, and 77:14-25.
[10] *See* Def.'s Ex. G, Report of Plaintiff's Expert Kathleen Lord-Jones, p. 5-6 of 8, and p. 8 of 8. *See also* Pl.'s Ex. 8, K. Lord-Jones Dep., 80:7-10.

should be avoided.[11]

In this case, at least two (2) properly trained and experienced flight attendants have testified about the importance of airline personnel's expedience in the removal of a disruptive passenger—those being the plaintiff's expert,[12] and one of American Airlines' own flight attendants, who was present for the incident that gives rise to this case.[13]

**B.** ***American Airlines Violated Each of the Three (3) Standards Above, in a Manner That Caused Severe Permanent Injuries to an Innocent Bystander.***

In this case, on May 30, 2021, Flight AA2123 returned to the gate at Ronald Reagan Washington National Airport, so that a disruptive but nonviolent passenger could be removed from the plane.[14] ██████████████████████████████████████████████████.[15]

At the gate, an American Airlines manager boarded the plane and spoke with the disruptive passenger.[16] At this American Airlines' manager's behest, the disruptive "passenger was walked towards the front of the plane, [near] where like the flight deck door is and where the boarding door is." Pl.'s Ex. 1, A. McMahon Dep., 39:19-22. It is undisputed that the disruptive passenger was not instructed to bring her carry-on bags with her,[17] nor did any American Airlines personnel think to remove the carry-on bags belonging to this disruptive passenger.[18]

Instead of continuing to walk the disruptive passenger out through the open boarding door,

---

[11] *See id.*

[12] *See* Pl.'s Ex. 8, K. Lord-Jones Dep., and Def.'s Ex. G, Report of Plaintiff's Expert Kathleen Lord-Jones.

[13] *See* Pl.'s Ex. 5, A. McMahon Dep., 81 :13-84 :12 ; and Pl.'s Ex. 11, at Bates pages AA-WILLIAMS 000090 – 000094, Report of American Airlines Flight Attendant Abigail McMahon, made Exhibit 2 to the deposition of Abigail McMahon.

[14] *See* Pl.'s Ex. 5, A. McMahon Dep., 35 :21 – 39 :5.

[15] *See* Pl.'s Ex. 6, at Bates pages AA-WILLIAMS 000047 – 000061.

[16] *See* Pl.'s Ex. 5, A. McMahon Dep., 38 :18 – 39 :9.

[17] *See* Def.'s Statement of Undisputed Material Facts, Doc. #34-10, ¶ 23.

[18] *See* Pl.'s Ex. 9, J. Sy Dep., 29:22 – 30:5.

the American Airlines manager in question then inexplicably "allowed [the disruptive passenger] to stand and continue to scream at" a flight attendant who was standing near the flight deck. Pl.'s Ex. 1, A. McMahon Dep., 39:19 – 40:9. No explanation has been provided as to why this American Airlines manager did not simply continue to walk the disruptive passenger out through the open boarding door, though the berated flight attendant has spoken to her "surprise" and dismay at the manager's actions in this regard.[19]

Worse still is that this disruptive passenger was then allowed to simply loiter at the front of the plane, next to the flight deck, for an undetermined period of time. Of course, the disruptive passenger's continued presence on the plane, while continuing to scream at a nearby flight attendant, ███████████████████████████████████████████████.[20]

But despite the ongoing nature of this security risk, American Airlines' personnel with knowledge of the risk actively instructed another flight attendant at the back of the cabin to walk up towards the flight deck. That instruction, of course, ████████████████████████ ██████████████████████████████████████████████████████████████████ ████████████████████ Pl.'s Ex. 3, at Bates page AA-WILLIAMS 000052. American Airlines' stated reason for its violation of its own mandatory procedure, in this regard, involved another event that had nothing to do with the safety of the passengers or the crew. Instead, this other event involved nothing more than a wallet that had been left at the gate.[21]

This other passenger's wallet had been secured, and was in the possession of American

---

[19] *See* Pl.'s Ex. 5, A. McMahon Dep., 83 :14 – 84 :12 ; and Pl.'s Ex. 11, at Bates pages AA-WILLIAMS 000090 – 000094, Report of American Airlines Flight Attendant Abigail McMahon, made Exhibit 2 to the deposition of Abigail McMahon.

[20] *See* Pl.'s Ex. 6, at Bates pages AA-WILLIAMS 000047 – 000061.

[21] *See* Pl.'s Ex. 5, A. McMahon Dep., 39 :8-18.

Airlines' personnel.[22]  It is undisputed that there was nothing pressing, or time-sensitive, about reuniting this other passenger with his or her wallet.  That task could be safely accomplished at any point in time.  One of American Airlines own flight attendants, who was present for the event in question, testified quite sensibly that "I would have expected that they'd deal with the safety-critical incident, that was the irate passenger, before dealing with the wallet."  Pl.'s Ex. 1, A. McMahon Dep., 54:17-20.

Nonetheless, American Airlines' personnel inexplicably instructed Flight Attendant Jane Sy to come retrieve this wallet while an active security risk was ongoing.[23]  As Flight Attendant ("F.A.") Jane Sy walked forward toward the flight deck, to retrieve the wallet, the disruptive passenger returned toward her seat[24] to retrieve her carry-on bags.[25]  When these two (2) individuals met in the aisle, the disruptive passenger shoved F.A. Jane Sy with enough force to cause her injuries that required her to go to the hospital.[26]  F.A. Jane Sy, in turn, landed forcibly on top of a peacefully sleeping passenger.[27]

That peaceably sleeping passenger was Njeri Williams, the plaintiff in this action.  Ms. Williams had required a wheelchair for assistance when boarding the plane.[28]  F.A. Jane Sy's collision with Njeri Williams was so brutal as to cause Ms. Williams to suffer new permanent and severe injuries.  Those injuries would not have occurred but for American Airlines' violation of each of the three (3) standards above.

Testimony of American Airlines' misconduct, and how that misconduct contributed to

---

[22] *See id.*
[23] *See* Pl.'s Ex. 5, A. McMahon Dep., 39:8-18 ; and 40 :10-17.
[24] *See* Pl.'s Ex. 5, A. McMahon Dep., 40 :17-19.
[25] *See* Pl.'s Ex. 9, J. Sy Dep., 29:22 – 30:5.
[26] *See* Pl.'s Ex. 5, A. McMahon Dep., 41 :16-17.
[27] *See* Pl.'s Ex. 2, N. Williams Dep., 134:18 – 135:9.
[28] *See* Pl.'s Ex. 2, N. Williams Dep., 115:19 – 116:3.

cause the plaintiff's injuries, has come not only from Plaintiff's expert in this case. It has also

come from <u>one of one of American Airlines' own flight attendants</u>, Abigail McMahon.[29] It was

Ms. McMahon, in her role as a flight attendant, who requested the removal of the disruptive

passenger.[30] She was present throughout the events in question.

Ms. McMahon has stated as follows:

> **[American Airlines'] management did not remove the [disruptive] passenger in a timely manner**, and allowed her to pause in the galley and remain onboard the aircraft for longer than she should have. Simultaneously, management instructed us to resolve a significantly less pressing issue during a safety critical moment. **The physical assault** [ . . . ] **occurred <u>because of these actions by management</u>**.

Pl.'s Ex. 2, Report of Abigail McMahon, at Bates page AA-WILLIAMS 000092 (emphasis

added).[31]

Like Plaintiff's expert,[32] Ms. McMahon was justifiably critical of American Airlines'

lackadaisical approach to the removal of this disruptive passenger.[33] From her vantage point as

both an eye-witness and a trained professional employed by American Airlines, Ms. McMahon

described the ongoing disturbance—while the disruptive passenger remained on the plane—as a

"safety critical moment." *Id.*

As such, like Plaintiff's expert,[34] Ms. McMahon was justifiably critical of ████

████████████████████████████████████████████████████

---

[29] *See* Pl.'s Ex. 5, A. McMahon Dep.

[30] *See* Pl.'s Ex. 5, A. McMahon Dep., 36 :16-38 :4.

[31] *See also* Pl.'s Ex. 5, A. McMahon Dep., 81:13 – 84:12 (authenticating Pl.'s Ex. 2, and testifying that it constitutes "my opinion of what I saw and what I experienced.").

[32] *See* Def.'s Ex. G, Report of Plaintiff's Expert Kathleen Lord-Jones, p. 5-6 of 8, and p. 8 of 8; and Pl.'s Ex. 8, K. Lord-Jones Dep., 80:7-10.

[33] *See* Pl.'s Ex. 11, Report of Abigail McMahon, at Bates page AA-WILLIAMS 000092; and Pl.'s Ex. 5, A. McMahon Dep., 81:13 – 84:12.

[34] *See* Def.'s Ex. G, Report of Plaintiff's Expert Kathleen Lord-Jones, p. 7-8 of 8; and Pl.'s Ex. 8, K. Lord-Jones Dep., 102:22 – 103:3.

███████████████████████████████████████████████

████████████████████████████████████████ entirely needless, involving only "a significantly less pressing issue." *Id.*

It is not surprising, therefore, that even one of American Airlines' own flight attendants concluded, quite candidly, that the injuries that give rise to this case occurred "because of" the compounding failures committed by American Airlines. *Id.*

## STANDARD OF REVIEW

In ruling on a motion for summary judgment, the court must draw all reasonable inferences in favor of the nonmoving party, and must accept the nonmoving party's evidence as true. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). And as Defendant correctly noted, "[t]o prevail on a motion for summary judgment, the moving party must show that the nonmoving party 'failed to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'" Def.'s Memorandum of Points and Authorities, Doc. #34-1, p. 8 (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)) (emphasis added).

But in this case, as explained in more detail hereinbelow, it is Defendant American Airlines—the movant here—who will bear the burden of proof at the trial of this case. *See* Montreal Convention art. 21(2), May 28, 1999, S. Treaty Doc. No. 106-45, 2242 U.N.T.S. 350. As to Plaintiff's claim for damages in excess of $171,469.78, a threshold that will be explained shortly, Defendant's burden on the instant Rule 56 motion is the same as that which would apply to a plaintiff seeking the entry of judgment as a matter of law in a traditional negligence case. *See*

---

[35] *See* Pl.'s Ex. 11, Report of Abigail McMahon, at Bates page AA-WILLIAMS 000092; and Pl.'s Ex. 5, A. McMahon Dep., 81:13 – 84:12.

*id*.

## **LEGAL ARGUMENT**

A quick summary of the evolution of the law that applies in this circumstance is perhaps helpful. The laws governing injuries suffered during international flight first originated in the 1920s, with the drafting of the "Warsaw Convention." *Wallace v. Korean Air*, 214 F. 3d 293, 296 (2d Cir. 2000). The Warsaw Convention "had two goals: to establish uniform rules of international air travel and to limit potential carrier liability for passenger injuries so as not to frighten away potential investors from the fledgling air industry." *Id.*

The Warsaw Convention accomplished those goals by (1) capping damages to approximately $8,300 per passenger, (2) establishing a "presumption" that air carriers are liable for passenger injuries, while (3) allowing carriers to avoid liability altogether by establishing a "due care" defense, which required the carrier to prove that it had "taken all necessary measures to avoid the damage, or that it was impossible [ . . . ] to take such measures." *Id*. at 296-97 (quoting Warsaw Convention art. 20(1)).

But as the "fledgling air industry" evolved into a massive, and extremely profitable, business, the laws applicable to that industry evolved in kind. The Second Circuit has summarized the differences between the Warsaw Convention and the later Montreal Convention, and the events that prompted those changes, as follows:

> From the beginning, the United States was hostile to the "stringent" limitations on liability imposed by the [Warsaw] Convention. *Day v. Trans World Airlines, Inc.*, 528 F. 2d 31, 36 (2d Cir. 1975). In particular, the $8,300 liability cap was regarded as too stingy. *See Day*, 528 F. 2d at 36. In November 1965, the United States announced its intention to withdraw from the Warsaw system if an international agreement could not be reached to raise the limits on liability. *See* 31 Fed.Reg. 7302 (1966); *Day*, 528 F. 2d at 36. This notice of denunciation led to intense negotiations which ultimately culminated in the Montreal Agreement of 1966. Through that Agreement, the air carriers agreed to raise the limit of liability to $75,000 for flights originating, terminating, or having a stopping point in the United

States.  *See Floyd*, 872 F. 2d at 1468 (citing Lowenfeld & Mendelsohn, 80 Harv. L. Rev. at 602).  In addition, [as to damages below the new $75,000 per passenger cap,] **the carriers agreed to eliminate the "due care" defense they had enjoyed under Article 20.**  *See id.*

The rationale for the new regime was straightforward.  In exchange for the cap on liability at the new level of $75,000, **the air carriers consented to a system under which they assumed "<u>virtual strict liability</u>" for death or injury to passengers**. *In re Korean Air Lines Disaster of Sept. 1, 1983*, 932 F. 2d 1475, 1485 (D.C.Cir. 1991).  As Lowenfeld and Mendelsohn, who represented the United States at Montreal, explained, this arrangement made sense because "[i]n terms of distribution of risk, the carrier would seem, in nearly every case, to be in the best position to spread the risk most economically" regardless of fault.  80 Harv. L. Rev. at 599-600.  In sum, a fundamental reason for the abandonment of the fault-based "due care" defense available under the Warsaw Convention was to guarantee to passengers the prospect of quicker and less expensive settlements.  *See id*. at 600.

*Id.* at 297 (bolding and underlining added, italics in original).

Today, the applicable language of the Montreal Convention is indeed broad, and there is no longer <u>any</u> cap on liability. *See Doe v. Etihad Airways, P.J.S.C.,* 870 F.3d 406, 422 (6th Cir. 2017).  Instead, the extent of plaintiff's damages today merely determines which of two (2) different standards apply.

The iteration of the Montreal Convention that applies to this case sets out a two-tiered system of damages. *Moore v. British Airways PLC,* 32 F.4th 110, 114 (1st Cir. 2022).  As to the first tier of the plaintiff's damages, a standard of "virtual strict liability" applies, rendering the injury compensable even when there is no evidence of negligence on the part of the airline. *Id.*  As to all damages above this first tier, a second standard applies, which only minimally raises the bar to compensability. *Id.*

The point of demarcation, where the first tier of a plaintiff's damages currently ends, and a second standard for liability takes effect, is 128,821 Special Drawing Rights. *Id.*  "Special Drawing Rights" are a unique form of international currency, created by the International Monetary Fund ("IMF"). *Furuta v. Hawaiian Airlines Inc.,* No. CV 19-00617 JAO-KJM, 2022

WL 3645764, at *5 (D. Haw. Aug. 24, 2022). They consist of, essentially, a weighted average of various nations' currencies. *Id.*

When the Montreal Convention first became effective in the United States, in 2003, the relevant damages threshold was "100,000 Special Drawing Rights." *See* Montreal Convention art. 21, May 28, 1999, S. Treaty Doc. No. 106-45, 2242 U.N.T.S. 350. Defendant is correct that since 2003, the Special Drawing Rights threshold has been adjusted for inflation. Def.'s Memorandum of Points and Authorities, Doc. #34-1, p. 13; *see also* Montreal Convention art. 24, May 28, 1999, S. Treaty Doc. No. 106-45, 2242 U.N.T.S. 350. So today, the threshold currently sits at 128,821 Special Drawing Rights.[36] And as of October 20, 2024, the IMF equates one (1) Special Drawing Right with 1.33107 American Dollars. [37]

At the risk of engaging in math, the undersigned has multiplied 128,821 times 1.33107. That multiplication shows that 128,821 Special Drawing Rights currently equates with $171,469.78 American dollars.

Pursuant to the Montreal Convention, an injured party can still recover damages above this $171,469.78 threshold from an international airline. But the "virtual strict liability" standard does not apply to damages above this threshold. Instead, the standard applicable to these higher damages raises that bar only minimally, placing the burden on the carrier to prove that its negligence did not contribute in any manner to cause the plaintiff's harm.

This second standard today thus looks much the same as the old "due care" defense did, in that it places the burden on the carrier to prove a negative—that its negligence did not contribute to causing the harm. But unlike the old "due care" defense, today there is no cap on the plaintiff's

---

[36] Inflation Adjustments to Liability Limits Governed by the Montreal Convention Effective December 28, 2019, 85 FR 3104-02

[37] International Monetary Fund, SDR Valuation, https://www.imf.org/external/np/fin/data/rms_sdrv.aspx (last visited October 20, 2024).

recovery. To the contrary, as to damages exceeding $171,469.78, any airline that fails to satisfy its burden before the jury will be liable for the entirety of the harm.

**I.**     **Since Defendant's Restrictive Definition of the Word "Accident" Has Been Rejected By the Majority of Courts To Whom Its Been Proposed, Defendant is Unable to Demonstrate the Absence of Questions of Fact Under the "Virtual Strict Liability" Standard.**

As to the plaintiff's first $171,469.78 in damages, Article 17(1) of the Montreal Convention sets the standard for liability as follows:

> The carrier is liable for damage sustained [ . . . ] upon condition only that the accident which caused the death or injury took place on board the aircraft or in the course of any operations of embarking or disembarking.

Montreal Convention art. 21, May 28, 1999, S. Treaty Doc. No. 106-45, 2242 U.N.T.S. 350. It is easy to see, from a plain reading of the language above, why Justice Ketanji Brown Jackson, during her time as a judge in this district, held in 2018 that such language requires the application of strict liability. *See In re Air Crash Over Southern Indian Ocean*, 352 F.Supp.3d 19, 32-33 (D.D.C. 2018) (quoting *Delgado v. Delta Air Lines, Inc.*, 2013 WL 9838339, *4 (S.D. Fla. Oct. 31, 2013)).

International airlines and their lobbyists, of course, participated in the Montreal Convention. There was an opportunity, at that Convention, to define the word "accident," as it applies in Article 17(1).

But the word "accident" is not a complex term of art. It is commonly understood. Merriam-Webster, for example, defines an "accident" as simply "an unforeseen and unplanned event or circumstance."[38] Most folks recognize an "accident" when they see one. No post-graduate degree is required.

And though they had the opportunity, the parties to the Montreal Convention saw no need

---

[38] Merriam Webster, https://www.merriam-webster.com/word-of-the-day/accident-2012-05-15 (last visited Oct. 20, 2024)

to set out any definition of the word "accident," refusing to limit the types of events that will come within the scope of that word's commonly-understood meaning.

But that history has not stopped airlines from urging courts to adopt restrictive definitions of that word when they have litigated these claims in the United States. At the appellate level, the airlines have succeeded only once, in an exceedingly modest fashion. In that case, the Supreme Court held that events occurring entirely within a passenger's body—as the result of ordinary, expected, and usual occurrences in flight—do not constitute an "accident."

A.     *The Supreme Court's Modest Limitation on What Constitutes an "Accident"*

Specifically, in *Air France v. Saks*, a classic "eggshell" plaintiff suffered hearing loss as the result of the normal pressurization of an aircraft during flight. 470 U.S. 392, 394-95 (1985). On appeal, the Supreme Court defined "accident," under Article 17(1), as an injury "caused by an unexpected or unusual event or happening that is external to the passenger." *Id*. at 405.

The Supreme Court's definition thus largely tracks that found in Merriam-Webster. The only gloss applied by the Supreme Court was the addition of the words "external to the passenger." *Id.* And in *Saks*, since the only unusual "event or happening" occurred entirely within the passenger's body, and thus was not "external to the passenger," the facts there did not meet the definition of an "accident." *Id.*

Since the Montreal Convention, the foregoing constitutes the only limitation on the definition of an "accident" that has ever been adopted or applied by any appellate court in the United States. And even the Court in *Saks* held that its "definition should be flexibly applied." *Id.* As an example, the Court noted that "torts committed by terrorists or fellow passengers" will, in appropriate cases, meet the definition of an "accident" for which airlines are subject to strict liability under Article 17. *Id*. (emphasis added).

### B.    The Supreme Court Has Declined to Restrict the Definition of the Word "Accident" in Any Other Manner.

Since *Saks*, the Supreme Court has addressed the definition of an "accident" only once. In *Olympic Airways v. Husain*, the facts giving rise to the case occurred during that time when flights were divided between smoking and non-smoking sections. 540 U.S. 644, 644 (2004). The plaintiff in *Husain* alleged that his pre-existing medical condition was aggravated by exposure to cigarette smoke on a commercial flight. *Id.* On appeal, the defendant-airline argued that whether an incident constitutes an "accident" under Article 17 should be determined by looking only at "the 'injury-producing event, which, according to [the defendant-airline], was the presence of ambient smoke in the aircraft's cabin." *Id.*

The Supreme Court rejected this proposal, since such an inquiry "neglects the reality that there are often multiple interrelated factual events that combine to cause any given injury." *Id.* at 653. The Court held that "any one of these factual events or happenings may be a link in the chain of causes and—so long as it is unusual or unexpected—could constitute an 'accident' under Article 17." *Id.* at 655. Consequently, *Husain* held that even the mere exposure to smoke fell within the ambit of Article 17, constituting an "accident" for which the airline was liable up to at least the then-applicable limitation on the initial tier of damages, of 100,000 Special Drawing Rights. *Id.*

In *Husain*, the defendant-airline also argued that unlike active malfeasance, its employees' mere inaction or passive nonfeasance could not meet the *Saks* definition of an "accident." That argument was rejected as well:

> The distinction between action and inaction, as [the defendant-airline] uses these terms, would perhaps be relevant were this a tort law negligence case. But [the plaintiff] does not advocate, and the [defendant-airline] vigorously rejects, that a negligence regime applies under Article 17 of the Convention. The relevant "accident" inquiry under *Saks* is whether there is an unexpected or unusual *event or happening*, [not whether the airline's alleged conduct consisted of an affirmative action as opposed to passive inaction].

*Id.* at 654-55 (emphasis in original). So in *Husain*, the Supreme Court refused to adopt any restrictive definition of the word "accident," beyond the very modest one set out in *Saks*.

> **C.** **Even the Primary Opinion Relied on By Defendant, in Support of Its Proposed Restrictive Definition, Concluded by Refusing to Adopt or Apply Any Such Restriction.**

In its Memorandum of Points and Authorities in this case, the defendant here cites *Lee v. Air Canada*, 228 F. Supp. 3d 302 (S.D.N.Y. 2017), in support of its own proposed restrictive definition of the word "accident." Def.'s Memorandum of Points and Authorities, Doc. #34-1, p. 11. But restrictive definitions of an "accident" have been rejected by the majority of the courts to whom they have been proposed—including by the *Lee* court itself, in the case relied on by Defendant.

After summarizing some restrictive definitions applied by certain district court judges in the 1990s—the portion of the *Lee* opinion cited by Defendant—the *Lee* court's review of the pertinent case law continued as follows:

> [O]ther district courts have simply applied the broad *Saks* definition of "accident," even where there was no clear causal connection between the conduct of the flight crew and the injury-causing event. In *Lahey v. Sing. Airlines, Ltd.*, 115 S.Supp.2d 464, 467 (S.D.N.Y. 2000), for example, the district court found that an "accident" occurred when a fellow passenger threw a tray of food at the plaintiff because this incident was "certainly 'unexpected and unusual' and 'external'" to the plaintiff. The court stressed that "the actions of the crew [we]re not relevant to the determination of whether the assault was an 'accident.'" *Id*. at 467; *see also Kwon v. Sing. Airlines*, 356 F.Supp.2d 1041, 1046 (N.D. Cal. 2003) ("accident" occurred when passenger lost her balance and stepped on another passenger's foot while trying to load her luggage into an overhead bin); *Wipranik v. Air Can.*, 2007 WL 2441066, *4 n.1 (C.D. Cal. May 15, 2007) (rejecting any requirement that the cause of the injury be a result of "a malfunction or abnormality in the aircraft's operation" and finding that an "accident" occurred when movement in the seat in front of plaintiff caused her cup of hot tea to slide off the tray).

*Lee*, 228 F. Supp. 3d at 308.

The *Lee* court went on to side with *Lahey*, *Kwon*, and *Wipranik*, holding that no controlling

authority from either the Supreme Court or the Second Circuit supported any restriction on the definition of the word "accident," aside from that exceedingly modest and "flexibly applied" restriction set out in *Saks*. *Id.*

The *Lee* court's decision in this regard was influenced in large part by courts' reluctance to apply any restrictive definition of the word "accident" since the 2004 issuance of *Husain*. Recall that in *Husain*, the Supreme Court was urged—and emphatically refused—to apply such a restriction. In the aftermath of *Husain*, therefore, the district court judges who have even entertained the prospect of such restrictive definitions have been few and far between.

### D. The Other Opinions Relied on By Defendant Each Pre-Date *Husain*.

It is notable, then, that the three (3) other opinions relied on by Defendant in this case, while factually distinguishable, also each pre-date *Husain*. Def.'s Memorandum of Points and Authorities, Doc. #34-1, p. 11-12. The earliest non-*Lee* opinion relied on by Defendant here is *Price v. British Airways*, 1992 WL 170679 (S.D.N.Y. July 7, 1992). In *Price*, the plaintiff "consumed several drinks of alcoholic beverages," and then subsequently "exchanged words with another passenger," who proceeded to punch the plaintiff in the face. *Id*. at *1. The district court held that the facts there did not constitute an "accident," under Article 17, since airlines could not "easily guard against such a risk through the employment of protective security measures."

*Price* has been cited only once since the Supreme Court's issuance of *Husain*. Unsurprisingly, the court that reviewed *Price* refused to adopt or apply the reasoning therein.

Specifically, in *Wilson v. Nuyorican Productions, Inc.*, the plaintiff was injured when a German Shepard on an international flight "bit [the plaintiff's] pant leg, causing her to twist, fall, and sustain certain injuries." 2008 WL 11439392 , at *1 (E.D.N.Y. Dec. 15, 2008). The district court in *Wilson* refused to apply *Price*, holding instead that the event in question constituted an

"accident" under Article 17 and *Saks*, since it was "caused by an unexpected or unusual event or happening that is external to the passenger." *Id.* at *3.

The *Wilson* court expanded on its reasoning as follows:

> There is simply no reason to limit the regulation that [the plaintiff] invokes in the way that [the defendant] suggests. If the [legislature, in its adoption of the Montreal Convention,] had wished to incorporate [some] definition of "accident" in its regulation [ . . . ], it could easily have done so. It did not. Indeed, its decision to do otherwise may well signal an intention not to flummox the federal judiciary with so arcane a term as "accident" by using a term that, if less concise, has a more obviously broad scope. The regulation [similarly] does not itself define "flight-related occurrence," nor is there any particular reason it should – the term has a natural, and quite expansive, meaning.

*Id.* In other words, "accident" has a commonly-understood, and broad, meaning. And since the Montreal Convention did not restrict that definition in any way, it is neither necessary nor just for the courts to do so either.

The next non-*Lee* opinion relied on by Defendant bears no relation whatsoever to the facts here. In *Levy v. American Airlines*, the plaintiff was an alleged criminal being extradited from Egypt to the United States when he attempted to slit his own wrists. 1993 WL 205857 (S.D.N.Y. June 9, 1993). An airline's attempts to restrain a dangerous passenger, even one who is dangerous to himself, are governed by the Tokyo Convention. *See id.* The Tokyo Convention has no application to the Defendant's summary judgment motion here. Since the *Levy* opinion relied primarily on its interpretation of the Tokyo Convention, as opposed to the Montreal Convention, it has no pertinent connection to this case.

The third and final non-*Lee* opinion relied on by Defendant here is *Stone v. Continental Airlines*, 905 F. Supp. 823 (D. Haw. 1995). The *Stone* court's scant reasoning for adopting a restrictive definition of "accident" consists of only two (2) sentences, that cite to only one opinion—the Southern District of New York's now heavily-questioned opinion in *Price*.

27

But like *Price*, the *Stone* opinion was considered and rejected by the Second Circuit in *Wallace*. And like *Price*, in the aftermath of *Husain*, the scant reasoning in *Stone* was considered and rejected by district courts in both *Lee* and *Wilson*.

### E.    *Recent Case Law from the Appellate Courts*

Conversely, the First Circuit has recently issued an exhaustive review of relevant case law discussing the definition of an "accident" under Article 17. In *Moore v. British Airways PLC*, the plaintiff allegedly tripped and fell while disembarking down a mobile staircase. 32 F. 4th 110, 113 (1st Cir. 2022). The distance between the staircase and the asphalt was allegedly greater than the distance between each of the risers on the staircase. *Id.* That discrepancy was alleged to have caused the plaintiff's fall. *Id.*

In its review of the definition of the word "accident," the First Circuit held that (1) the Montreal Convention did not intend to restrict that definition in any way, (2) no restriction to that definition should be applied, other than the modest one set out in *Saks*, and (3) whether an accident has occurred pursuant to the *Saks* definition"—an "unexpected or unusual happening or occurrence that is external to the passenger"—should be determined from the perspective of a reasonable passenger. *Id.*

Pursuant to these determinations, based on its exhaustive review of pertinent case law, the trip and fall in *Moore* was held to constitute an accident under Article 17. The First Circuit's holdings were based, in further part, on its interpretation of the Montreal Convention's clearly-stated purpose:

> The Montreal Convention does not mince words. It declares its purpose, in part, as "ensuring protection of the interests of consumers in international carriage by air," and recognizes "the need for equitable compensation based on the principle of restitution." Montreal Convention, pmbl. Scholars aptly "have described the Montreal Convention as a treaty that favors passengers rather than airlines, *Ehrlich v. Am. Airlines*, 360 F. 3d 366, 371 n.4 (2d Cir. 2004), and have read its preamble

as "acknowledging the previous imbalance of interests and staking out where the priority lies," Bin Cheng, A New Era in the Law of International Carriage by Air: From Warsaw (1999) to Montreal (1999), 53 Int'l & Compar. L.Q., 833, 844 (2004).

*Id.* at 120.

### F. A Summary of the Current State of the Law

So in sum, (1) co-passenger torts can constitute an accident, (2) an airline's inaction can form the basis of an accident, and (3) the only limitation ever applied by any appellate court in the United States, as to what may constitute an accident, is that the event in question must have been "caused by an unexpected or unusual event or happening that is external to the passenger." [39]

### G. The Factually Analogous Case That is Most Directly On-Point

The case that is most closely analogous to this one is *Wallace v. Korean Air Lines*, 214 F. 3d 293 (2d Cir. 2000). In *Wallace*, the plaintiff was sexually assaulted by a neighboring passenger, while she was asleep. It was undisputed that the event in question occurred without any airline employee's knowledge. Nor did the airline commit any inaction which was alleged to have contributed to cause the circumstances which allowed the assault to occur. It was not alleged, for example, that the plaintiff had asked to move to a different seat, only to be rebuffed by airline personnel.

Nor was it alleged that the plaintiff alerted airline personnel of the assault, who failed to respond reasonably. To the contrary, the only conduct of the airline in that case consisted of its failure to intervene in a middle seat passenger's clandestine, one-handed assault of a window seat passenger who was asleep. The Second Circuit held that these facts constituted an "accident" under Article 17, reversing the district court.

---

[39] *Moore v. British Airways PLC,* 32 F. 4th 110, 113 (1st Cir. 2022)

In this case, the conduct of the airline is far more egregious, and directly contributed to causing the plaintiff's injuries. Here, an American Airlines manager walked a disruptive passenger to the front of the plane, and then inexplicably allowed that disruptive passenger to loiter there, instead of continuing to walk her out through the open boarding door. Two flight attendants have testified, based on their respective training and experience, that this needless delay resulted in an improper, untimely removal. One of those flight attendants, of course, received her training and experience in that regard from American Airlines itself.

Second, American Airlines  to address "a significantly less pressing issue" during "a safety critical moment." It is unsurprising that drew this criticism from its own trained flight attendant.

Third, American Airlines violated both TSA regulations and IATA guidelines by failing to remove the disruptive passenger's carry-on items either with or immediately after her. As both Plaintiff's expert and American Airlines' own flight attendant have testified, American Airlines' compounding failures caused the injuries in question, as the loitering disruptive passenger thus felt compelled to return to her seat for her carry-on items, where she collided with foot traffic that should have properly been suspended during this Level 1 Disturbance.

The airline misconduct present here far exceeds that in *Wallace*, or in any of the case law summarized hereinabove. And at a more basic level, the incident that gives rise to this case was certainly unexpected or unusual, and was entirely external to Njeri Williams. *See Saks*. As such,

it constitutes an "accident" under Article 17 and *Saks*.

## II. As to Plaintiff's Damages in Excess of $171,469.78, Questions of Fact Exist From Which Reasonable Jurors Could Infer That Defendant is Unable to Meet Its Burden At Trial.

Claims for damages above $171,469.78 are governed by Article 21 of the Montreal Convention. Article 21 states as follows:

> The carrier shall not be liable for damages [above $171,469.78 ] if the carrier proves that (a) such damage was not due to the negligence or other wrongful act or omission of the carrier or its servants or agents; or (b) such damage was solely due to the negligence or other wrongful act or omission of a third party.

Art. 21(2) (emphasis added). In this manner, the Montreal Convention flips the burden of proof applicable in traditional negligence cases. Under the Montreal Convention, "[t]he burden of proving their non-negligence is on Defendants." *Mansour v. British Airways PLC*, 2020 WL 1847750, *3 (W.D. Wash. Apr. 13, 2020).

Pursuant to this standard, an airline's inaction or passive nonfeasance can form the basis of the plaintiff's negligence claim. For example, in *Buckwalter v. U.S. Airways, Inc.*, 2014 WL 116264 (E.D. Pa. Jan. 13, 2014), the plaintiff was injured while descending a staircase from the plane, when another passenger fell forward and struck her. The stairs were "in 'working condition,' with no defects or abnormalities."

But a witness testified that the deplaning process was "sort of disorderly." So on summary judgment, the trial court noted that "[i]f it is true that there was a disorderly deplaning process [ . . . ], and the flight crew took no action to ensure an organized deplaning process, then an omission of the flight crew may have occurred." Consequently, the trial court denied summary judgment as to damages within the purview of Article 21, since "genuine issue[s] existed as to whether the flight crew's negligence and/or omissions during the deplaning process caused [the] Plaintiff's injuries."

31

Additionally, the standard applicable to a negligence claim under Article 21 is the traditional one, of "reasonable prudence"—what would reasonably prudent airline personnel have done in this circumstance? As such, no violation of any government regulation need be proven to establish negligence.

For example, in *Furuta v. Hawaiian Arilines, Inc.*, 2022 WL 3645764 (D. Haw. Aug. 24, 2022), the plaintiff was injured when turbulence caused him to hit his head on the ceiling. On summary judgment, the court applied Article 21 as follows:

> The Court concludes that there is a triable issue as to Defendant's negligence. On the one hand, Defendant proffered evidence that it did not violate any [Federal Aviation Regulation ("FAR")] regarding the route or the operation of the flight, and Plaintiff has not directed the Court to any specific FARs that Defendant violated. On the other, Article 21(2) places the burden on Defendant to disprove negligence, and the Court finds there is a factual dispute as to whether Defendant operated the aircraft in a "careless or reckless manner."

> *            *            *

> [The plaintiff's expert] declared that the flight passed directly over a highly active "kona low" that had squall lines of deep convection. In simple terms, the plane flew over an active storm. The Court thinks it reasonable for the factfinder to infer carelessness if Defendant navigated the plane directly into (or above) a strong weather pattern. Common sense dictates that bad weather leads to bumpy flights. Defendant, of course, may (and does) put for the evidence that it operated the flight in a reasonably safe manner, but the Court concludes that Defendant has not foreclosed a finding of negligence at this stage. Whether Defendant could have avoided the rough air – or even whether it was required to avoid the stormy area – is a matter for the factfinder.

*Furuta v. Hawaiian Arilines, Inc.*, 2022 WL 3645764, *12 (D. Haw. Aug. 24, 2022).

Again, the airline misconduct in this case far exceeds that which was present in the case law above. Here, American Airlines violated the proper protocol for the timely removal of a disruptive passenger, as two flight attendants have testified. American Airlines also ███████ ████████████████████████████████████████████████████████████████████ ███████████. And it violated TSA regulations and IATA guidelines by failing to remove a

disruptive passenger's carry-on items either with or immediately after the passenger.

Indeed, a reasonable juror could infer from the facts that Plaintiff's injuries and damages were caused by Defendant's negligent conduct. First, the AA manager did not immediately communicate to Passenger 9F the captain's decision to remove her from the flight. *See* Plaintiff's Statement of Facts in Dispute ("Pl. SOFID") at ¶¶ 44(a)(i)-(viii). Rather, the AA manager exercised his discretion to cajole and lure Passenger 9F off the plane under the auspices that she was only being requested to exit the plane only to speak with the manager. *Id.* The AA manager also told Passenger 9F that she could leave her bags on the flight because he only wanted to speak with her. *Id.* A reasonable juror could infer that this action caused the irate Passenger 9F to become confused about whether she was being removed from the flight and that her confusion resulted in her taking actions into her own hands to retrieve her bags after she discovered the AA manager had misled her about her flight status.

The AA manger could have simply instructed Passenger 9F that she was being removed from the plane and directed her to grab her bags or advise that security or the airline crew would bring her bags to her once she is off the plane. *Id.* Had Passenger 9F refused to deplane, the AA manager and the captain had other means to resolve the situation without any risk of harm to other passengers. *Id.*

The AA manager also allowed Passenger 9F to remain on the plane and berate another crew member rather than escorting Passenger 9F completely off the plane. *Id.* Passenger 9F likely lingered on the plane to find an opportunity to go back and retrieve her bags. Indeed, as she was walking to the front of the plane, she exclaimed that she did not want to leave her bags if she was "getting kicked off the plane." Pl. SOFID at ¶ 24(e). After hearing that statement, the AA manager

still allowed Passenger 9F to remain on the plane and berate Ms. McMahon. Pl. SOFID at ¶¶ 44(a)(i)-(viii). Passenger 9F would later push past the AA manager and assault Ms. Sy, who then fell onto Plaintiff. A reasonable juror could infer that the AA manager misjudged Passenger 9F's willingness to deplane without her bags and created the circumstances in which Passenger 9F lingered on the plane and ultimately assaulted Ms. Sy to retrieve her bags.

Then, while the AA manager was attempting to cajole and lure Passenger 9F off the plane, AA management and law enforcement directed the flight crew to summon another passenger to the front of the plane to retrieve a misplaced wallet. *Id.*; Pl. SOFID at ¶¶ 44(a)(i)-(viii). Ms. Sy then responded to the announcement and decided to retrieve the wallet for the passenger. Pl. SOFID ¶¶ 24(k) – 27(f). Ms. Sy admits that it was not necessary for her to grab the wallet immediately. *Id.* Ms. Sy made a discretionary decision to retrieve the wallet for the passenger. *Id.* When she went to grab the wallet, Ms. Sy knew that the situation with Passenger 9F was still unresolved, ongoing and that she could get hurt by the irate passenger. *See id.* A reasonable juror could infer from these facts that AA management acted negligently in requiring the flight crew to summon a passenger to the front of the plane while the situation with Passenger 9F was active. Moreover, a reasonable juror could infer from these facts that Ms. Sy acted negligently by walking to the front of the plane while the situation with Passenger 9F was still active, while the plane had not been secure, and knowing that retrieving the wallet at that time was dangerous, not only for the passenger, but for herself. Indeed, if a member of the AA management remarked to Ms. Sy "well you walked into that," surely a reasonable juror could infer the same.

And finally, the AA manager was unable to restrain or prevent Passenger 9F from pushing past him to proceed down the aisle. *See.* Pl. SOFID at ¶¶ 44(viii). If the AA manager was concerned about Passenger 9F using her bags to harm other passengers or flight crew when he asked her to

exit the plane to speak with him, he should have been extremely worried what Passenger 9F would do with her bags after she exhibited that she was willing to push past him to retrieve them. At this point, Passenger 9F had elevated from an irate passenger to an active problem on the move. The AA manager could have taken measures to do more to prevent Passenger 9F from re-entering the aisle and assaulting Ms. Sy. *See id.* A reasonable juror could infer that the AA manager had observed enough from Passenger 9F to know that if she re-entered the aisle of the plane that she could foreseeable get involved into physical contact with other passengers or the flight crew. A reasonable juror could infer that the AA manager negligently allowed Passenger 9F to remain on the plane, allowed her menacing behavior to escalate toward Ms. McMahon, and ultimately allowed Passenger 9F to push past him and place herself in a position to harm other passengers and/or the flight crew.

Based on the foregoing, and many more factors, American Airlines' compounding failures combined and concurred to cause Plaintiff's injuries. One of American Airlines' own flight attendants has even stated that the incident occurred "because of" her employer's misconduct.

As such, at a minimum, questions of fact exist from which reasonable jurors could infer that American Airlines is unable to meet its burden at trial.

## **CONCLUSION**

Accordingly, Plaintiff respectfully submits to this Honorable Court that Defendant American Airlines, Inc.'s Motion for Summary Judgment must be denied, as to both (a) Plaintiff's damages claims that are subject to Article 17 of the Montreal Convention, and (b) Plaintiff's damages claims that are subject to Article 21 of the Montreal Convention

Respectfully submitted,

BOND LAW, PLLC

By: /s/ Johnnie D. Bond, Jr.
Johnnie D. Bond, Jr. (485488)
3221 M Street, N.W.
Washington, DC 20007
Telephone: (202) 683-6803
Facsimile: (202) 949-8434
jbond@bondpllc.com

*Attorneys for Plaintiff*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this October 23, 2024 a true copy of the foregoing Plaintiff

Njeri Williams' Opposition to Defendant American Airlines' Motion for Summary Judgment was

served by electronic service via upon:

Justin M. Cuniff Esq.
One Park Place
Suite 425
Annapolis, MD 21401

Andy Uria
One Park Place, Suite 425
Annapolis, MD 21401

Will Lattimore Esq.
2101 Sixth Avenue N
Suite 1100
Birmingham, AL 35203

Alan Holcomb Esq.
945 East Paces Ferry Road, NE
Suite 2275
Atlanta, GA 30326

_/s/ Johnnie D. Bond, Jr._____
Johnnie D. Bond, Jr. Esq.